Blanchard v. Ely.

## BLANCHARD *vs.* ELY and others.

In an action for the recovery of the price stipulated for the building of a *steamboat,* the plaintiff is entitled to recover the full amount, without any deduction by way of *recoupment* of damages to the defendant in consequence of damages sustained by him for the *loss of trips* and the *profits* resulting therefrom occasioned by defects in the boat or its machinery.

The defendant in such case is, however, entitled to. an allowance for moneys necessarily expended by him in supplying *defects* in the vessel or its machinery, so as to make it conform to the plan specified in the contract; and where it is manifest that an allowance on that account ought to have been made, and was not made by the jury, a new trial will be granted.

The courts of *common law* seem inclined to adopt the rules of the *civil law* in respect to damages for the breach of contracts relating to personal property, which is that the party entitled to claim performance may claim *damages* for the non-performance *in respect to the particular thing, the object of the contract;* but not such as may have been accidentally occasioned thereby *in respect to his own affairs*—as for instance, a *lessee* who is evicted by title paramount may claim the *expense of removal* and indemnity for *advanced rents,* but is not entitled to recover for *loss of custom* established whilst residing in the house.

It is no bar to a recovery that one of several defendants has become possessed of the right of action prosecuted against him and his co-defendants, unless his name appears upon the record both as *plaintiff* and *defendant.*

The doctrine of *damages* generally considered.

THIS was an action of *debt,* tried at the New York circuit in October, 1837, before the Hon. OGDEN EDWARDS, one of the circuit judges.

In *September,* 1834, a contract was entered into between the parties, by which the plaintiff engaged to build for the

defendants a *steam-boat*, intended to ply on the Susquehanna river between *Owego* and *Wilkesbarre;* the boat to be completed and put in operation by the first day of *May*, 1835, for which the plaintiff was to be paid the sum of $12,500. The boat was built but not entirely completed, when she was *accepted* by a *committee* of the defendants, and proceeded down the river about the *seventh* day of May; she was accepted on condition that what remained to be done in her completion, should be done, and which was not done until some time in *July*. On her return to Owego she broke her shafts, which were repaired at the expense of the plaintiff. This delayed her four days, and after she again started for Owego was delayed sixteen days more by reason of the lowness of the water. On her second trip she again broke her shafts, and the defendants, at their own expense, procured a new set from New York, which cost about $700. The defendants, after they had took possession of the boat, enlarged her wheels and made other alterations, and proved that the guards were too low, and that the expense of altering them would cost $250. Several witnesses for the defendants proved the iron of the shafts to be bad : in this, however, they were contradicted by the plaintiff's witnesses. It was proved that a trip between Owego and Wilkesbarre could be performed in four days at a nett profit of $100 per trip, and that the river between those places is navigable only four months in the year. When the plaintiff first rested, the defendants produced in evidence an instrument under seal, bearing date 28th May, 1835, executed by the plaintiff, whereby, for the consideration of $500, the plaintiff assigned to *James Pumpelly*, one of the defendants in this cause, the *contract* upon which this suit is brought, and stated therein that he had received and endorsed upon the contract the sum of $7975 34, and that he had directed his attorney to pay over the balance due upon the contract, when collected, to Mr. Pumpelly, after deducting certain charges. On the production of this instrument, the plaintiff read in evidence an instrument *of the same date*, signed by Pumpelly, whereby he engaged to pay over to the plaintiff all moneys he should receive by virtue of the assignment made to him,

*deducting such sums and interest thereon as he had that day advanced to the plaintiff.* The defendants insisted that the assignment thus executed to Pumpelly, one of the defendants in the cause, was a bar to a recovery. The judge, however, ruled otherwise, and instructed the jury that they should deduct from the amount otherwise due to the plaintiff such sum as would be equal to the expenses necessarily incurred by the defendants in remedying such *defects* as existed in the boat or its machinery; but that they were not authorized to take into consideration the delay of the boat, or loss of trips, or loss of profits consequent upon any defect in the boat or machinery in reducing the amount of the plaintiff's recovery—the damages sustained by the defendants from those causes being too remote and consequential to be allowed in this action, and the remedy of the defendants for any injury sustained from those causes being by action against the plaintiff. The jury found a verdict in favor of the plaintiff for $5240 31, and consequently must have allowed the whole sum of $12,500, with the interest thereof from 1st May, 1835, *deducting* only the sum admitted by the plaintiff in his assignment to Pumpelly to have been received by him, and a sum of about $100 besides. The defendants asked for a new trial.

*S. Stevens,* for the defendants.

*S. P. Staples,* for the plaintiff.

*By the Court,* COWEN, J. The objection that the assignment of the articles of agreement by the plaintiff to one of the defendants, should have been received as a bar, is founded on the principle that where the right of the creditor and the liability of the debtor, or any one of several debtors meet in the same person, such coincidence works a release by operation of law. The reason is that a man cannot sue himself; the action is suspended by the voluntary act of the creditor; and is gone and discharged forever. 2 Wms' Exec. Phila. ed. 1832, p. 811. It is obvious from the bare statement of the argument, that it must mean a vesting of the

Blanchard v. Ely.

*legal right*, or, in other words, a right to sue in the creditor's own name, in the person of his debtor. Otherwise the reason fails. It will, I apprehend, be found applicable to those cases only where the same individual, in order to sue, must appear on the record both as plaintiff and defendant. *Main waring* v. *Newman*, 2 Bos. & Pul. 120. The case of *Van Ness* v. *Forrest*, 8 Cranch, 30, will be found an authority for this distinction. Besides, it is suggested that the assignment in this case was merely by way of pledge, or security to one of the defendants for money lent; the plaintiff thus still retaining his interest as general owner. It is certainly very clear, that even if he could have divested his legal interest by an absolute assignment, that could not be done by merely *pledging* it; but he could not part with it in either form. This court has held that a defendant may, before suit brought, purchase a chose in action against the plaintiff, and use it as a set off: and we have often held that the *assignee* is the real party, and shall be protected. But this has always been held in an equitable sense, which would rather go to *favor* the present action than to *defeat* it.

Did the judge narrow the jury too much in the rule of damages? The plaintiff had failed in some comparatively trifling respects, to make so perfect a boat as he had stipulated for. The shafts were not of adequate strength, in consequence of which the boat was interrupted in some of her trips; and the company incurred expense in procuring repairs to be done, and in towing the boat to a proper place for undergoing her repairs. All this the judge left to the jury to deduct in their discretion, from the acknowledged balance of account for building her. But he directed them not to allow for *delays*, and for *profits* which might have been made from the trips that were lost. No common law authority was cited at the bar, one way or the other, having any direct application to the measure of damages in such a case as this; nor am I aware that any exists. If there be none, it is somewhat singular, considering the many contracts for building boats and other vessels which must have been made in England and this country. We have

to regret that the attention of the counsel seemed to have been entirely turned from the character of this claim in the abstract, by a remark of the judge implying that damages for loss of profits were admissible in a *cross action*, but not *in mitigation*. This led the counsel for the defendant to stop with citing *Reab* v. *McAllister*, 8 Wendell, 115, to show that proof of any damages arising from a plaintiff's breach of the contract upon which he sues, may be received to reduce his claim. This we all understand to be clearly so. The counsel for the defendant, too, merely thought it their duty to cite cases showing that in an action on a warranty of land, the plaintiff recovers only the consideration money paid, with interest and costs, &c.; and we were reminded particularly of one reason for that rule as given by Chief Justice Savage, in *Dimmick* v. *Lockwood*, 10 Wendell, 150, viz. "That it would be ruinous and oppressive to make the *seller* respond in damages, for any accidental rise in value of the land or the increased value in consequence of the improvements by the purchaser." He, at the same time, however, notices some technical reasons for the rule which render it less decisive in respect to executory contracts, especially those which regard personal property. The prevalence of the rule is very extensive in its application to covenants of title. Vide 1 Selw. N. P. 533, Phil. ed. 1839. The rule is more pertinent when applied, as it has been in several cases to the breach by failure of title of a covenant to convey. *Baldwin* v. *Munn*, 2 Wendell, 339. Sutherland, J. there adopts a former remark of Ch. J. Kent, importing that it must block up sales of real estate, if the vendor were to be made liable in proportion to the rise of property. It is added on the same authority, that "The safest rule is, to limit the recovery as much as possible, to an indemnity for the actual injury sustained, without regard to the *profits* the plaintiff has failed to make." Id. 406. This was A. D., 1829. As long ago as 1811, in *Letcher* v. *Woodson*, 1 Brock. 212, Marshall, Ch. J. laid down the rule of damages on a similar covenant, in nearly the same words with Mr. Justice Sutherland. *Combs* v. *Tarlton's Admrs.*, 2 Dana, 466, 7, S. P., A. D. 1834. This rule would cut off all rise of the value intermediate the contract

and time fixed for its execution. The rule on agreement to sell and deliver goods, is universally broader; giving the vendee advantage of the rise in market, and the consequent advantage of profit on any sale which he might have made at the time stipulated for delivery, or whenever it becomes due. *Smee* v. *Huddlestone*, Sayer's Dam. 49. See many other cases cited in Ch. J. Marshall's note to *Letcher* v. *Woodson*, 1 Brock. 218. *Clark* v. *Pinney*, 7 Cowen, 681, 687, and the cases there cited. Nay more, under circumstances, the rise is considered even down to the time of the trial. Id. The rule of damages in respect to contracts for the sale of chattels is the general one, and some courts have refused to depart from it, in measuring damages for breach of covenants to convey real estate. *Hopkins* v. *Lee*, 6 Wheaton, 109, 117, 118. *Cannell* v. *McLean*, 6 Har. & Johns. 297. I do not dwell upon these cases, more of which may perhaps be found. In both classes, the courts are seeking after an indemnity; that is to say, making good to the vendee what he has paid his money for. Both classes of cases profess to deny the allowance of damages remotely consequential, as of profits resting in speculation. The possible or even probable use to which the vendee may put the property, aside from a market sale, is clearly excluded. Going upon analogy, then, suppose the owners of this boat, the defendants, had sold out ; in the absence of evidence that there had been a rise of the boat's value in market, we must take the stipulated value at which it was to be built, *Bailey* v. *Clay*, 4 Rand. 346, and then the sum which would command the materials and work for making good the defects, would be the measure of damages in an action, or by way of recoupment in a defence. In like manner, a contract to insure a cargo will not, in the event of loss, carry the speculative profits of the adventure, though these may be insured In express terms, even by an open policy. 1 Phil. on Ins. 320, 325. Id. 46. Yet, insurance is called pre-eminently a contract of indemnity. The damages are what will restore the value of the cargo on ship board at the port of departure. Id. 46, *et seq.* The rule is nearly the same in respect to damages for breach of warranty. The defect

arising from the vice warranted against, must be made good in such sense that the article shall fetch a sound price, which *prima facie*, we have seen is the one agreed on between warrantor and warrantee. 4 Rand. *ut supra.* 2 Leigh's N. P., Philad ed. 1838, p. 1506. *Caveat emptor in search of a horse*, 1 Rural Lib. N. Y., No. 5, for 1837, p. 140. *Clare* v. *Maynard*, 7 Carr. & Payne, 741 ; 1 Nev. & Perr. 701, S. C. *Chesterman* v. *Lamb*, 4 Nev. & Mann. 195 ; 2 Adolph. & Ellis, 129, S. C. 1 Selw. N. P., ed. before cited, p. 654, tit. Deceit, I. 1, and notes. *Bacon* v. *Brown*, 4 Bibb, 91. Yet, in all the cases mentioned, as in that of insurance, there is no doubt, that by an express contract, on good consideration, the vendor may stipulate expressly to indemnify in respect to loss of profits arising from the defect against which he contracts. In short, it will be seen by the cases cited and many more, that on the subject in question, our courts are more and more falling into the track of the civil law, the rule of which is thus laid down by a learned writer : " In general, the parties are deemed to have contemplated only the damages and interest which the creditor might suffer from the non-performance of the obligation, in respect to the particular thing which is the object of it ; and not such as may have been accidentally occasioned thereby in respect to his own affairs." 1 Evans' Poth. 91, Lond. ed. 1806. He illustrates the rule by the rise of value in goods which the promissor fails to deliver. He adds, if the lessor's title to a house fail, he is bound to pay to his lessee the expense of removal, and indemnify him against the advance of rents, but not against the loss of custom in a business he may have established while residing in the house. He also adverts to the distinction that the vendor may, notwithstanding, incur liability for extrinsic damages of the creditor, if it appear they were stipulated for or tacitly submitted to in the contract. One instance is that of stipulating to deliver a horse in such time that a certain advantage may be gained by reaching such a place. There the debtor shall, on default, pay for the loss of the advantage. The case of tacit submission is illustrated by a case of demising premises expressly for use as an inn. There, if,

the tenant be evicted, a loss of custom may be taken into the account. Id. 91, 92. This latter rule was in some measure acted upon in the late case of *Driggs* v. *Dwight*, 17 Wendell, 71. There was a promise to demise a tavern stand at a day certain, which was refused by the promissor, after the promissee had broken up his former residence, and proceeded with a view to take possession. We allow- ed to the latter, damages for removing his family and furni- ture; in this, following the case of *Ward* v. *Smith*, 11 Price, 19. In *Brackett* v. *McNair*, 14 Johns. R. 170, the broken contract was to transport goods from one place to another; and the increase of value in the goods at the latter place was allowed as damages; though even this principle of estimate seems to have been denied in the previous case of *Smith* v. *Richardson*, 3 Caines, 219. In another case, the plaintiff sued for stone delivered to be used in building a church, and the defendants claimed a recoupment, be- cause they had not been delivered at the day. They in- sisted, among other things, on damages, by reason of their workmen lying idle for want of the material. The court did not deny the claim absolutely but held that the defend- ants, even if the delivery had been stopped, would have been bound to use diligence in keeping their workmen em- ployed on other materials, to be supplied as soon as they could be procured; thus avoiding all unnecessary loss, and that the deduction must be governed with a view to that principle. *Miller* v. *Mariner's Church*, 7 Greenl. 51, 55. The unreasonable delay of workmen stood somewhat on the footing of unreasonably delaying the boat in this case, which the judge refused to allow, though he directed that damages might be due for taking the boat to a proper place, for being repaired.

But to go the length insisted upon by the defendants, would, I apprehend, transgress what the law should allow, even had the plaintiff, without fraud, tortiously broken the machinery of this boat, as by a negligent collision, in navi- gating his own boat. The profits of a voyage broken up, are constantly denied consideration, even in questions relat- ing to marine trespasses. *The Amiable Nancy*, 3 Wheat.

546, 560, and the cases there cited. *La Amistad De Rues* 5 id. 385, 389. Of course I lay out of view, as do all the cases, that the transaction is accompanied with wanton outrage, fraud or gross negligence; the cases just cited from Wheaton, show that these are exceptions. And see *Merrils* v. *The Tariff Manufacturing Co.* 10 Conn. R. 384. The case of *De Wint*, v. *Wiltse*, 9 Wendell, 325, must, I think, have been regarded by this court as a fraudulent breach of a covenant to keep a ferry in repair, which materially benefitted the plaintiff's tavern. The defendant left it unrepaired, in order to favor his own ferry. Therefore damages were allowed for loss of custom at the plaintiff's inn. Pothier, as before cited, maintains the same distinction. In *Nurse* v. *Barnes*, T. Raym. 77, the defendant, in consideration of £10, promised to demise a mill to the plaintiff, who laid in a large stock to employ it, which he lost, because the defendant refused to let him have possession. The jury were held properly to have assessed the damages at £500. Very likely it appeared that the breach of contract was committed to favor some particular interest of the defendant or his friend, though the case mentions a simple refusal to perform.

The case at bar, so far as I have been enabled to discover from the evidence, stands entirely clear of *fraud*. If some of the iron used for shafts was rotten, there is nothing going to fix knowledge, or that I see, gross negligence in the plaintiff or his superintendent. The extent to which the iron proved bad, was doubtful, though the jury were authorized to infer it was by no means all of a good quality. There is no proof, however, that such iron was used intentionally; and we ought not to infer that a fraud was committed by any one. No new trial can, therefore, be granted on any error of the judge.

Still, we think, complete justice cannot be done without the cause being submitted to another jury; for the plain inference is, that they totally disallowed any thing whatever for defects in the boat. The plaintiff's counsel make a computation by which they show that $62 deduction was made; but even this assumes that interest ran on the bal-

Orange Co Bank v. Dubois.

ance mentioned in the assignment, $4524 66 from the first of May. This could not be so. All parties agreed that the boat was not finally completed till pretty well along in July, and she was accepted, subject to completion. At most, the interest ought not to run till after the job was finished. It is sufficient to say, we think there is a strong preponderance of evidence in favor of some deduction.

New trial granted, on payment of costs.